Filed 7/30/24  P. v. Nunn CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081334 |
| v. | (Super.Ct.No. FVI17000058) |
| SHAKIR OMARI NUNN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael S. Dauber, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Elana Miller and Christine T. Freidman, Deputy Attorney Generals, for Plaintiff and Respondent.

1

A jury found defendant and appellant Shakir Omari Nunn guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and torture (§ 206). The trial court sentenced defendant to prison for 25 years to life; the seven-year torture sentence was stayed pursuant to section 654. Defendant raises four issues on appeal. First, defendant contends there is insufficient evidence to support his torture conviction. Second, defendant asserts the first-degree finding should be reversed because there is insufficient evidence of torture. Third, defendant contends the trial court erred by denying his motion in limine to suppress the statements he made to law enforcement officers. Fourth, defendant asserts his trial counsel was ineffective for failing to renew the suppression motion during trial. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. BACKGROUND

Defendant lived in a house with nine of his children. No adults other than defendant lived in the house. Defendant is six feet tall. Defendant's driver's license reflects he weighs 250 pounds. The victim, Dominic, was one of defendant's sons. In January 2017 the victim was eight years old, four feet tall, and weighed 45 pounds. The victim was "very skinny," his ribs and hip bones protruded.

---

[1] All subsequent statutory references are to the Penal Code unless otherwise indicated.

S.N. is another of defendant's sons; he was 12 years old in January 2017. The victim and S.N. (collectively, the brothers) did not attend school and they slept on blankets, without beds. Defendant regularly instructed his daughters to beat the brothers, and they did. If the brothers fought back, then defendant would strike the brothers.

Defendant also beat the brothers without the daughters' involvement. Defendant's typical acts against the brothers included punching, kicking, choking, hitting them with a belt, picking them up by their necks and dropping them, drowning them, and locking them in a closet or garage. On one occasion, the brothers ran away from home, but the police returned them to defendant. Upon the brothers' return, defendant said, " 'I'm going to fuck you all up now.' " Defendant punched, kneed, kicked, and choked S.N. Defendant beat the brothers with a belt and then forced them to do 100 pushups, sit-ups, and jumping jacks.

Also on a regular basis, the brothers were starved, while at other times, they were only permitted to eat peanut butter and jelly or ham sandwiches, regardless of what food the rest of the family ate; there was plenty of food in the house. Defendant said only being permitted the two types of sandwiches is "what it was like in prison." On January 4, 2017, defendant punished the brothers by not feeding them. S.N. was hungry, so he attempted to steal food from the trash. Defendant "slapped [S.N.] a few times, and he told [S.N.] to go to bed."

3

B.     DEFENDANT'S CRIMES

Defendant got out of bed around noon on January 5, 2017. Defendant noticed that the victim was not in his bedroom. Defendant walked into the living room and saw an empty bag of Skittles. The victim had taken the Skittles from a cabinet and eaten some of them. Defendant yelled, " 'Don't steal from me,' " as he tried to find the victim. The victim hid in a corner of the dining room, next to a deep freezer. Defendant found the victim and "started beating him" with a belt. The victim cried and screamed. Defendant slapped the victim's face and "kneed him in his chest." The knee to the chest caused the victim to fly backward, hit a wall, and land on his back. Defendant instructed the victim to stand, and he did.

Defendant threw the victim on the floor face-up. Defendant instructed one of his daughters to hold the victim's legs, and she complied. The victim lay on his back, with his knees bent and his arms stretched over his head. Defendant kneeled on the victim's arms—one knee on each arm. Defendant clasped his hands together, reached back, and then struck the victim's stomach. The victim groaned in pain, but defendant repeatedly struck the victim's stomach with clasped hands. Defendant hit the victim's stomach 10 to 15 times.

Defendant stopped striking the victim and directed one of his daughters to punch the victim. The daughter lightly punched the victim's stomach three times; the victim did not react. Defendant resumed striking the victim with his hands clasped together; he hit the victim approximately five more times. Defendant instructed the victim to stand

4

up and remove his pants. Defendant then beat the victim's buttocks and back while the victim cried.

Defendant instructed the victim to stand in a corner, and the victim stood in the corner. Defendant said to S.N., "[G]o over there and look at him . . . . This is your fault." When S.N. looked at the victim, the victim's eye was red—it looked like there was blood in it. Defendant took a nap. Upon waking, he instructed the victim to move to another corner in the house, away from the Skittles. The victim moved slowly and complained that his arms hurt. Defendant grabbed the victim's arms and extended them straight over the victim's head, "as high as they could be." Defendant left the house to enroll his daughters in a home school program. The victim continued to stand in the corner.

The victim told one of his brothers, I.N., that he needed to use the restroom, that he was tired, and that he did not feel well. The victim lay on the bathroom floor. Defendant was away from the house for approximately two hours. When defendant arrived home, he thought the victim was pretending to be unwell. Defendant instructed the victim to stand, and the victim complied but repeatedly said he did not feel well.

Defendant told the victim to race him down the hallway. If the victim reached the end of the hall before defendant and jumped over a six-inch tall speaker, then defendant would give the victim a sandwich. If the victim did not win, then defendant would strike him with a belt. The victim ran, but he was slow, "like, really tired and out of breath after a couple steps, and he stopped midway." When the victim stopped, he fainted and fell. Defendant beat the victim with a belt. The victim did not respond.

Defendant removed the victim's clothes and placed him in the shower. Defendant shouted at the victim "to stop faking and get up." The victim was unresponsive. Defendant again beat the victim with a belt. The victim remained unresponsive.

Defendant laid the victim on the floor in the hallway. Defendant instructed one of his daughters to check the victim for a heartbeat. The daughter checked but could not find a heartbeat. Defendant performed CPR on the victim, but the victim did not respond. While defendant tried to resuscitate the victim, liquid the colors of Skittles came out of the victim's nose. Defendant called 911.

At approximately 11:00 p.m., paramedics transported the victim to a hospital where the victim died within a few hours. The victim's cause of death was blunt force abdominal injury, which led to the victim bleeding to death internally. An autopsy of the victim revealed ruptures in the victim's intestinal tract, "multiple areas of hemorrhage" along the digestive tract, a tear in the victim's liver, a bruise on his pancreas, and "[m]assive bleeding" in his abdomen. All of the injuries were fresh. It appeared the injuries were caused by "a blunt force impact, maybe more than one . . . possibly a punch . . . , in the center of the abdomen." The force applied would have been "substantial"—sufficient force to push the parts of the victim's digestive system against his spine and crush them because "[i]t's really a crushing injury in a sense. It takes considerable force to do it."

6

The victim had a bruise on the right side of his forehead and blood in his right eye, which was caused by a blunt impact. There was blood in the victim's nose and cuts on his lips. There were two bruises on the victim's chest, bruises behind each knee, and bruises on the victim's back. The victim had three healing rib fractures that appeared to be six to eight weeks old.

## DISCUSSION

### A.      TORTURE CONVICTION

Defendant contends his torture conviction is not supported by substantial evidence.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944.)

Torture is the infliction of great bodily injury upon another person "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) The first element of great bodily injury is supported by the evidence that the victim died.

The second element of intent to inflict extreme pain and suffering can be established by a " ' " witness's description of [the] defendant's behavior in committing the offenses." ' " (*People v. Powell*, *supra*, 5 Cal.5th at p. 945.) Defendant weighed 200 pounds more than the victim, who was a child. Defendant's children described defendant repeatedly beating the victim with a belt, restraining the victim while repeatedly using his clasped hands to strike down on the victim's abdomen in a manner that crushed the victim's organs, and striking the victim so that he flew backward into a wall. The beatings took place over a period of 11 hours. The extreme and continuous nature of defendant's acts, particularly given the size difference between defendant and the victim, demonstrate an intent to cause extreme pain and suffering.

Next, we examine the purpose of defendant's acts. "Revenge" is not defined in the torture statute. (§ 206.) Therefore, we look to the plain meaning of the word. (*People v. Whitmer* (2014) 230 Cal.App.4th 906, 917.) "Revenge" is defined as "[v]indictive retaliation against a perceived or actual wrongdoer; the infliction of punishment for the purpose of getting even." (Black's Law Dict. (11th ed. 2019) p. 1577.)

While testifying, S.N. was asked, "[D]id you hear your dad say anything about why [the victim] was getting in trouble? Was it just for leaving the bedroom or was there something else that had been done?" S.N. responded, "[The victim] had went and took some Skittles. So he ate some Skittles, and that's why he had gotten in trouble." While testifying, one of defendant's daughters was asked, "Do you know why the beating was happening?" She responded, "Because my dad, . . . [h]e was, like, 'He ate a

8

whole bag of Skittles,' or whatever." Defendant yelled, " 'Don't steal from me,' " as he tried to locate the victim, who was hiding after eating the Skittles.

One can infer from the foregoing evidence that the victim was not permitted to take the Skittles, and defendant viewed the victim's act of taking and eating the Skittles as a wrongful act. Defendant then beat and killed the victim in retaliation for the perceived wrongful act. In sum, defendant savagely beat the victim as revenge for the victim eating Skittles.

Defendant asserts his purpose was to discipline S.N.—not to seek revenge. Discipline is "[p]unishment intended to correct or instruct." (Black's Law Dict. (11th ed. 2019) p. 582.) Torture can be for "the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) To the extent defendant beat the victim over an 11-hour period in order to teach the victim not to take candy in the future, then defendant's purpose would be persuasion. Thus, one can look at defendant's actions as retaliation/revenge for taking the candy, and/or as seeking to persuade the victim not to take candy in the future. Either way, the evidence supports a conviction for torture. (§ 206.)

B.      FIRST DEGREE MURDER FINDING

Defendant contends substantial evidence does not support the torture finding that raised his murder conviction to first degree murder. (§ 189, subd. (a).)

"The elements of first degree murder by torture[2] are: '(1) acts causing death that involve a high degree of probability of the victim's death; and (2) a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose. [Citations.]' [Citation.] The prosecution need not establish that the defendant intended to kill the victim [citation], but must prove a causal relationship between the torturous acts and the death. [Citation.] 'The finding of murder-by-torture encompasses the totality of the brutal acts and the circumstances which led to the victim's death. [Citations.] The acts of torture may not be segregated into their constituent elements in order to determine whether any single act by itself caused the death; rather, it is the continuum of sadistic violence that constitutes the torture.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 643.)

We begin with the element of a high probability of death. Defendant was two feet taller and 200 pounds heavier than the victim. Defendant restrained the victim's arms with his knees and summoned his daughter to restrain the victim's legs. Defendant then clasped his hands together and repeatedly smashed them down into the victim's abdomen, crushing the victim's vital organs. Given the size difference between defendant and the victim, the repeated blows, and the blows being to the area of vital organs, there is substantial evidence of a high probability of death.

---

[2] Defendant's briefs cite law pertaining to a torture-murder special circumstance allegation. (§ 190.2, subd. (a)(18) [death penalty or life without parole].) Defendant was not charged with a torture-murder special circumstance.

10

The element of a willful, deliberate, and premeditated intent to cause extreme pain or suffering is supported by the evidence of defendant taking breaks from the beating and then resuming it. The breaks in the beating gave defendant time to pause and reflect on his actions, and defendant repeatedly chose to continue hitting the victim. Defendant beat the victim with a belt; kneed him in the chest, which caused the victim to hit a wall; threw the victim on the floor; and punched the victim while the victim was restrained. Defendant then took a break and directed one of his daughters to punch the victim. Defendant then resumed striking the victim. Defendant took a nap for "an hour or two." Upon waking, when the victim complained his arms hurt (presumably from defendant kneeling on them), defendant forced the victim to stand in a corner with his arms stretched overhead. Defendant left the house for hours and, upon returning, he beat the victim with the belt in the hallway and the shower. Defendant's continued choices to cause the victim suffering, when defendant had time to reflect on his decisions, support the finding that defendant had a willful, deliberate, and premeditated intent to cause extreme pain or suffering.

We discussed *ante*, the evidence supporting a finding that defendant acted for the purpose of revenge. In regard to the element of causation, the victim's vital organs were crushed by defendant's repeated blows to his abdomen. The victim bled to death internally from his various organs being damaged as a result of the beating. Therefore, the torture was a direct cause of the victim's death. In sum, there is substantial evidence

supporting the first degree murder finding that defendant perpetrated the murder by means of torture. (§ 189, subd. (a).)[3]

### C. MOTION TO SUPPRESS

#### 1. *PROCEDURAL HISTORY*

##### a. Detective's Interview of Defendant

At the start of defendant's interview with San Bernardino County Sheriff's Detective Mooradian, the following was said:

"[Detective]: We appreciate you coming down here voluntarily.

"[Defendant]: Umm-hmmm (affirmative),

"[Detective]: That door is just closed for privacy reasons, okay?

"[Defendant]: Oh, yeah.

"[Detective]: Uh, you're not under arrest, you're not being detained. Right now, we're just trying to figure out what—

"[Defendant]: Right.

"[Detective]: . . . . happened.

"[Defendant]: Right.

"[Detective]: Um, so I really appreciate you, um, coming down here."

---

[3] On appeal, defendant has also asserted that substantial evidence does not support a first degree murder finding of willful, deliberate, and premeditated murder. (§ 189, subd. (a).) We have concluded that substantial evidence supports the torture finding that raised defendant's murder conviction to first degree murder. (§ 189, subd. (a).) Therefore, we do not address whether the evidence would also support a finding of willful, deliberate, and premeditated murder.

12

The interview continued, and then there was a break in the interview. When the interview resumed, the detective said to defendant, "Appreciate you being willing to talk to us still. Uh, like I said, still (unintellig[ible]) you can leave at any time."

After more discussion, the following was said:

"[Defendant]: Okay, I see what's going on. I need—I need an attorney now.

"[Detective]: Okay are you saying you don't wanna talk to me without an attorney?

"[Defendant]: I need an attorney now 'cause now it's getting—it's getting a little . . .

"[Detective]: Okay, well here's the deal. You're not under arrest. You're not being detained. I understand you said you want an attorney if you wanna leave, you can. But I'm trying to get to the bottom of . . .

"[Defendant]: I understand that."

Defendant did not leave and continued speaking with the detective. As the interview continued, the following was said:

"[Defendant]: This is over. This interview's over.

"[Detective]: Okay you're free to leave. However your kids will be in protective custody.

[¶] . . . [¶]

13

"[Defendant]: That's—that's crazy. I—I knew you guys were gonna do that. I'm gonna speak to my kids."

Shortly thereafter, the detective said to defendant, "Right this way sir," as though showing him out of the interview room. The detective said he had "one other thing" he needed to tell defendant and then said, "We should probably do it in the room. It's your choice if you want to walk back in there, but I don't wanna do it where your kids can hear you." Defendant continued talking with the detective about the victim. The detective then explained that the reason he brought defendant back into the room was to inform him that the victim had died at the hospital. Defendant continued speaking with the detective about the victim. Eventually, the detective said one of defendant's children had described the victim being held down, and the detective arrested defendant.

Initially, defendant's children lied to the law enforcement officers about what happened to the victim. When the victim died, and one of defendant's daughters learned about his death, she told the law enforcement officers the truth of what defendant did to the victim.

b.      Motion

Defendant's pretrial suppression motion was based upon (1) defendant not being informed of his rights prior to speaking with law enforcement officers (*Miranda v. Arizona* (1966) 384 U.S. 436, 473-475), and (2) law enforcement officers continuing to speak with defendant after he requested an attorney (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485). The trial court denied the motion finding that, during the interview

14

with the detective, defendant was not in custody and defendant's statements were voluntary.

### 2. *ANALYSIS*

Defendant contends the trial court erred by denying his pretrial suppression motion.[4] Statements taken in violation of *Miranda* and *Edwards* generally cannot be presented in the People's case-in-chief. However, the prosecutor can use a defendant's voluntary statements, taken in violation of *Miranda* and *Edwards*, for impeachment purposes when cross-examining a defendant. (*People v. Peevy* (1998) 17 Cal.4th 1184, 1193, 1195, 1201-1202.) A defendant's statements are presumed to be involuntary if the defendant is in custody, requests counsel, and the law enforcement officer's questioning continues without an attorney being made available to the defendant. (*People v. Thomas* (2012) 54 Cal.4th 908, 926.)

We examine whether defendant was in custody when he requested an attorney. " 'Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must "apply a deferential substantial evidence standard" [citation] to the trial court's factual findings regarding

---

[4] A transcript or recording of defendant's interview with the detective was not presented to the jury. Rather, in the prosecutor's case-in-chief, the prosecutor asked the detective about one statement defendant made during the interview. The prosecutor also used defendant's statements from the interview when cross-examining defendant. In defendant's appellate argument, he approaches this issue as though the entirety of his law enforcement interview was presented to the jury during the prosecutor's case-in-chief. Nevertheless, we will address defendant's contention.

15

the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave." ' " (*People v. Moore* (2011) 51 Cal.4th 386, 395.)

"When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation. [Citation.] All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present." (*People v. Moore*, *supra*, 51 Cal.4th at p. 395.)

The interview occurred in the sheriff's station. The interview began at 11:00 p.m. After speaking with the detective, defendant asked to check on his children, and the detective responded, "Absolutely. Yeah, yeah, yeah," and stopped the interview so defendant could leave the room to see his children. At 12:20 a.m., the interview resumed. A second break occurred, and the interview resumed at 1:40 a.m. Following a third break, the interview resumed at 2:40 a.m. Defendant was arrested shortly after 2:40 a.m. Thus, the interview lasted approximately three hours and 40 minutes, with multiple breaks.

The form of the interview was primarily a one-on-one conversation between the detective and defendant. However, at one point, a second detective asked defendant some questions about the Skittles and told defendant the hospital to which the victim had been taken. The interview began with the detective trying to understand how

16

defendant and his children spent their day, whether the victim had medical issues in the past, and how defendant disciplined his children. Eventually, the interview turned accusatory when the detective asserted only defendant had the size and strength to inflict the victim's injuries. As the interview became accusatory and defendant said he wanted a lawyer, the detective reminded defendant that defendant was free to leave.

There were no indicia of arrest. The detective repeatedly reminded defendant that defendant was free to leave. Defendant stopped the interview to visit his children outside of the interview room. Defendant stopped the interview a second time, in order to leave, and again left the interview room. Given that defendant twice stopped the interview and twice left the interview room, a reasonable person would have felt free to end the questioning and leave.

Defendant contends that, given the circumstances, no reasonable person would have felt free to walk away from the interview with the detective. Defendant fails to address the fact that he twice stopped the interview and walked away. Accordingly, defendant's argument is unpersuasive.

Defendant asserts he was in custody during the interview because defendant was "arrested immediately at the end of the interrogation based entirely on facts learned during the interrogation." Defendant has misread the record. Defendant was arrested because defendant's daughter disclosed that defendant killed the victim. In other words, defendant was not arrested based "entirely on facts learned during the interrogation" of defendant.

17

In sum, defendant was not in custody when the detective interviewed him. Therefore, the trial court did not err by denying the suppression motion.

### D. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends his trial counsel was ineffective for failing to renew the motion to suppress when, during trial, defendant's son, J.N., allegedly testified defendant was handcuffed prior to speaking with the detective. Defendant asserts that the use of handcuffs would have supported his argument that the interview was a custodial interrogation violative of *Miranda*.

" 'To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." ' " (*People v. Lewis* (2001) 25 Cal.4th 610, 674.)

J.N. testified that he and his brother went to the sheriff's station in a patrol car. The prosecutor asked J.N. how he knew defendant was at the sheriff's station because defendant did not travel in the car with J.N. The following was said:

"[J.N.]: Because when I was sitting on the chair, and then I saw him walk. I saw the police have handcuffs on him, and he walked past.

"[Prosecutor]: So you[] saw your dad in the police station?

"[J.N.]: Yes."

At the end of defendant's interview with the detective, the detective placed defendant under arrest and instructed defendant to "put your hands behind your back," presumably to place him in handcuffs. That indicates defendant's hands were free, and defendant was not in handcuffs during the interview. J.N. did not specify when he saw defendant at the sheriff's station. One can reasonably infer that J.N. saw defendant in handcuffs after defendant was arrested when defendant's interview with the detective had ended. Therefore, there was no basis for renewing the motion to suppress. Defendant's trial counsel's performance was not deficient.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
                                                                    J.


We concur:


RAMIREZ
                         P. J.


MENETREZ
                         J.


19